IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD RAY, et al., | No. C-08-3627 MMC |
| Plaintiffs, | **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REMANDING STATE CLAIMS** |
| v. | |
| CITY OF OAKLAND, et al., | |
| Defendants. / | |

Before the Court is defendants City of Oakland and Chief of Police Wayne Tucker's[1] (collectively, "the City") motion for summary judgment or, in the alternative, partial summary judgment, filed August 28, 2009.[2] Plaintiffs Richard and Sally Ray have filed opposition, to which the City has replied.[3] Having reviewed the papers filed in support of and in opposition to the motion, the Court rules as follows.[4]

---

[1] Chief Tucker is sued solely in his official capacity.

[2] The City's unopposed Request for Judicial Notice filed in connection therewith is hereby granted.

[3] By order dated October 1, 2009, the hearing previously scheduled on said motion was vacated.

[4] To the extent plaintiffs seek a continuance to obtain additional evidence, the request is denied for the reasons that plaintiffs have failed to comply with the requirements of Rule 56(f) and have failed to make any showing to justify such continuance. Likewise, to the extent plaintiffs seek leave to amend, the request is denied. Although the City, in its moving papers, makes reference to various pleading deficiencies, the Court, as set forth

## FACTUAL[5] AND PROCEDURAL BACKGROUND

On February 17, 2007, shortly before 5:00 a.m., plaintiff Richard Ray ("Ray") and his friend Kenneth Lee ("Lee") were sitting in Lee's car, which was parked on the street in front of Ray's house in Oakland, California. (See Ev. Supp. Pls' Opp'n Tab D ("Richard Ray Dep.") 51:9-52:4.) Lee, who had been drinking, was unable to drive home because Ray was holding Lee's car keys until Lee was sober. (See Richard Ray Dep. 57:16-58:5.) Lee was wearing street clothes with a leather jacket, and Ray was wearing pajamas, slippers, a bathrobe, and a baseball cap. (See id.; Simmons Decl. Ex. 1 ("Sally Ray Dep.") 48:11-12; Ev. Supp. Pls' Opp'n Ex. 1 Tab A ("Use of Force Report").)

Ray's neighbor, Margaret Pinter ("Pinter"), saw the two men sitting in the car, before dawn, and believed a crime was underway. (See Logue Decl. Ex. 4 ("Pinter Dep.") 8:5-13:12.) In particular, the scene "looked just like what had happened the month before right in front of [her] house," when she had witnessed and reported an auto theft. (See id. 13:3-7, 21:2-22:3). It was dark outside and Pinter, who was preparing to leave her house and "wanted to be certain of [her] personal safety," called 911 at approximately 4:50 a.m. to report that "it looked as though someone was breaking into a car." (See id. 8:9-25, 13:18-25; Sidney Decl. ¶ 6.) Pinter told the 911 operator that the car was a dark-colored BMW, possibly red, with one or two men inside, one of whom was wearing a white shirt or jacket, and that the men were "rifling" around inside the vehicle. (See Pinter Dep. 16:9-18:13; Use of Force Report; Sidney Decl. Ex. 2.) A few minutes after her first call, Pinter called a second time because she "felt more sure that something was happening," and asked the operator to have the police "please come." (See Pinter Dep. 18:14-19:18.) She was concerned the police would not arrive in time, and she told the 911 operator about the prior

---

below, applies herein the legal standard for summary judgment.

[5] The following facts are either undisputed or, to the extent disputed, are stated in the light most favorable to plaintiffs. With regard to defendants' objections to plaintiffs' evidence, to the extent the Court has relied herein on any such evidence, the objections thereto are overruled, and to the extent the Court has not relied on such evidence, the Court does not reach the objections thereto.

auto theft and the generally high level of crime in the neighborhood.  (See id. 19:9-18, 21:21-22:3.)

Soon after Pinter's second call, officers Adam Humphrey ("Humphrey") and Jaime Majarucon ("Majarucon") of the Oakland Police Department each arrived at the scene, separately but within moments of one another.  (See Logue Decl. Ex. 2 ("Majarucon Dep.") 54:7-22.)  At the same time, police dispatch notified the officers that Pinter had stated the suspects were still on the scene.  (See Use of Force Report at 2.)  Seeing a red BMW matching the description given by Pinter, with two men moving around inside, the officers approached the car on foot, each coming from a different direction.  (See id. 54:7-21; Ev. Supp. Pls' Opp'n Tab F 79:2-14.)  Ray exited the car and began walking in the direction of his house, at which point the two officers unholstered their service weapons and Officer Humphrey announced "police" and told Ray to get into a "prone" position, i.e., to lay on his stomach.  (See Ev. Supp. Pls' Opp'n Tab F and Logue Decl. Ex. 1 (collectively, "Humphrey Dep.") 43:1-44:25, 44:9-12, 45-46; Richard Ray Dep. 61:3-8.)  Officer Humphrey knew "from [his] training and experience that car thieves/burglars often carry weapons on them," and observed that Ray was "wearing a bulky robe and [Lee] had on a thick leather jacket making it difficult to see their waist area."  (See Use of Force Report.)  Ray told the officers he had a bad back and could not "get down," and the officers "grabbed [him]" and "put [him] down on the ground."  (See Richard Ray Dep. 63:15-23, 64:4-6.)  Ray was upset and speaking in a raised voice to the police officers.  (See Pinter Dep. 33:6-22; Sally Ray Dep. 47:10-16.)  Both Ray and Lee eventually were handcuffed.  (See, e.g., Logue Decl. Ex. 3 ("Lee Dep.") 29:4-6, 29:21-23; Sidney Decl. ¶ 14).  At some point thereafter, Humphrey asked their names, and ran the license plate and both individuals' names.  (See Humphrey Dep. 70:18-25.)

At some point during the above events, two additional Oakland Police Department officers, Donna Hoppenhauer ("Hoppenhauer") and Tyler Fought ("Fought"), arrived on the scene, the latter accompanied by a police dog.  (See Pinter Dep. 23:6-11, 120:4-17; Ev. Supp. Pls' Opp'n Tab I ("Fought Dep.") 127:4-6.)  Pinter approached and said something to

the effect of "I'm the one who called . . . please stop." (See Pinter Dep. 26:3-12.) Fought told Pinter twice to "get back" and she did so, after which Hoppenhauer explained that Pinter "needed to be away from the activity," and Fought explained that it was unsafe to approach the police dog. (See Pinter Dep. 26:21-27:13; 36:13-37:25.)

Sally Ray saw her husband being stopped by the police and went outside. (See Sally Ray Dep. at 39:16-21.) An officer directed her to go back inside; she complied and then stood behind her screen door. (See id. 41:21-42:1.) The officers did not ask her any questions. (See Ev. Supp. Pls' Opp'n Ex. 2 ("Sally Ray Decl.") ¶ 6.) From inside her house, Sally Ray observed that Pinter and Pinter's husband "were outside of their house standing on the sidewalk or their porch and were not being restricted in any meaningful manner" (see id. ¶ 5), except to the extent that the officers required Pinter to "go back" away from the scene (see Sally Ray Dep. 45:16-17).

Ultimately, both Ray and Lee were released at the scene.[6] (See Use of Force Report at 2.)

On July 29, 2008, plaintiffs filed the instant lawsuit alleging, as against the City, causes of action under 42 U.S.C. § 1983, as well as state law claims for assault, battery, false imprisonment, intentional infliction of emotional distress, negligence, loss of consortium, and violations of California Civil Code §§ 51, 52, and 52.1. The City has moved for summary judgment on each of plaintiffs' causes of action or, in the alternative, for partial summary judgment.

**LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant

---

[6] The record contains varying estimates as to how long the above-described encounter lasted. Based on police department dispatch records, the entire incident, beginning with Pinter's first 911 call to the point at which the officers reported that the incident had concluded, lasted thirty minutes. (See Sidney Decl. ¶ 14 and Ex. 2.) Lee testified at deposition that Ray was handcuffed for about thirty minutes. (Lee Dep. 29:21-23.) Sally Ray testified at deposition that Ray was handcuffed and kneeling for more than ten minutes, then standing for another six or seven minutes before he was released, (see Sally Ray Dep. 50:6-51:16). Thereafter, in her declaration, Sally Ray changed her estimate to forty-five minutes to one hour for the entire incident from the point the officers arrived until Ray was released (see Sally Ray Decl. ¶ 6).

1  summary judgment "if the pleadings, the discovery and disclosure materials on file, and
2  any affidavits show that there is no genuine issue as to any material fact and that the
3  movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).
4      The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),
5  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.
6  v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary
7  judgment show the absence of a genuine issue of material fact. Once the moving party
8  has done so, the nonmoving party must "go beyond the pleadings and by [its] own
9  affidavits, or by the depositions, answers to interrogatories, and admissions on file,
10 designate specific facts showing that there is a genuine issue for trial." See Celotex, 477
11 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried
12 its burden under Rule 56(c), its opponent must do more than simply show that there is
13 some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the
14 [opposing party's] evidence is merely colorable, or is not significantly probative, summary
15 judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted).
16 "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light
17 most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587
18 (internal quotation and citation omitted).

### DISCUSSION

**1.  Federal Claims**

21     Plaintiffs allege the City is liable for the above-described actions of its police
22 officers.[7] A municipality "may be held liable for a violation of federal law under section 1983
23 only if [it] has adopted an illegal or unconstitutional policy or custom." Robinson v. Solano
24 County, 278 F.3d 1007, 1016 (9th Cir. 2002).[8] Specifically, "[t]o impose municipal liability

---

[7] No individual officer has been named as a defendant.

[8] Alternatively, a plaintiff may show that the challenged conduct was the result of a "deliberate choice" made on the occasion by a policymaker or his/her delegate, or was ratified by such policymaker, see Fuller v. City of Oakland 47 F.3d 1522, 1534 (9th Cir. 1995), or that it was the result of the municipality's failure to adequately train due to a

5

under § 1983 for a violation of constitutional rights [a] plaintiff must show: (1) that [the plaintiff] possessed a constitutional right of which []he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the 'moving force behind the constitutional violation." Plumeau v. School Dist. #40, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotations omitted). Here, the City argues, plaintiffs have no evidence to support a finding that any such policy or custom exists. Plaintiffs, in response, contend the testimony of the officers "demonstrates a consistent tacit policy to draw weapons with or without probable cause." (See Pls' Opp'n Br. 6:9-10.) As set forth below, plaintiffs' argument is not persuasive.

Although Officer Humphrey testified he was following Oakland Police Department policy in unholstering his firearm before identifying himself as a police officer, he could not recall what that policy was nor did he explain the basis of his belief that such policy existed. (See Humphrey Dep. 62:12-17.) Plaintiffs have offered no evidence that Majarucon even believed he was acting in accordance with a policy, let alone that he was able to describe the content of such policy, and plaintiffs have offered no other testimony or documentary evidence articulating such a policy.[9] Indeed, Hoppenhauer testified that she does not "know of a written standard that says you shall or shall not point your gun at somebody in certain circumstances," adding that the department "can't possibly write every circumstance out where that would be a reasonable thing to do." (See Ev. Supp. Pls' Opp'n Tab H ("Hoppenhauer Dep.") 85:16-20.)

---

"deliberate indifference to the rights of others," see Plumeau, 130 F.3d at 439 n.4. Here, however, plaintiffs have failed to offer any evidence that would tend to support any such finding.

[9] To the extent plaintiffs rely on an Oakland Police Department "training bulletin" regarding "high risk vehicle stops" of moving vehicles (see Gropper Nelson Decl. Ex. B.), plaintiffs have failed to offer any evidence suggesting such publication applies to the type of incident at issue, let alone that the officers were following the bulletin's directions in the instant encounter. (See id. (describing procedure for "Following the Suspect Vehicle[,] Choosing a Location to Stop the Suspect Vehicle[, and] Stopping the Suspect Vehicle"). (See id.)

1  Although in response to the question: "So, to your knowledge, was there a common
2  practice department-wide for officers to unholster and point firearms during reported auto
3  burglaries," Hoppenhauer responded, "I hope so, for safety, yes" (see Hoppenhauer Dep.
4  87:9-12), a mere hope that a department-wide practice exists is insufficient to raise a triable
5  issue as to the existence of such a practice.  Moreover, to the extent Hoppenhauer's "yes"
6  can be read as an acknowledgment of a department-wide practice or policy, the
7  parameters of any such practice are not thereby defined, as the question preceding
8  Hoppenhauer's response is ambiguous.

9  Even assuming, arguendo, Hoppenhauer's above-cited testimony suffices to define
10 a policy, that testimony, when read in context, can, at best, be construed as describing a
11 practice requiring officers, for their personal safety, to unholster their service weapons
12 when approaching what reasonably appears to be an ongoing auto burglary, (see id.) and
13 leaves the officers' subsequent conduct of the investigation to the officers' independent
14 judgment based on the particular circumstances pertaining at the time.  (See id. at 87:13-
15 23;[10] see also Ev. Supp. Pls' Opp'n Tab G ("Majarucon Dep.") 103-104, 164:1-5, 130:14-
16 131:5 (describing how officer's assessment of "totality of the circumstances" at scene,
17 including number of suspects, determines how he proceeds after initial detention).)  Thus,
18 to the extent plaintiffs allege the officers either kept their guns out longer than reasonably
19 necessary, treated Ray with more force than was reasonable, and/or detained him for more
20 than a reasonable period of time, plaintiffs have failed to raise a triable issue that any such
21 conduct was based on a policy adopted by the City, and, consequently, the City cannot be
22 held liable for any such violation.

23 Assuming the officers were acting pursuant to a departmental policy or custom at
24 the time they initially approached Ray with their service weapons unholstered, plaintiffs

---

[10] In response to the question: "And to the best of your knowledge, other factors would only be determined after they had pointed their firearms, not prior to; is that correct?" Hoppenhauer responded, "Well, I mean, given the totality – I need specific details, like, yes, there is a report of a burglary in progress, here's a vehicle that maybe was described, you actually have the vehicle, and there's people in the vehicle or around the vehicle that may or may not – you know, there's a lot of different factors, so I don't know that I can give you a definite answer . . . ."  (See id.)

7

nonetheless have failed to raise a triable issue that such conduct violated Ray's constitutional rights. The undisputed facts demonstrate that the officers, based on "specific and articulable facts," had an objectively reasonable suspicion that justified initiation of an investigatory stop. See Terry v. Ohio, 392 U.S. 1, 21 (1968) (holding question of reasonableness analyzed under objective standard). In particular, the officers were acting on a report from a citizen witness who had twice called 911 to state that an auto theft was in progress; the officers found the described vehicle in the reported location; and the officers saw the suspects moving about in that vehicle, one of whom, upon the officers' approach, got out and began walking away. (See Humphrey Dep. 130:9-16.) The question next presented is whether it was reasonable under the circumstances for the officers to have their guns drawn at the time they initiated such detention.[11]

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"; factors relevant to an evaluation of whether such coercion constitutes excessive force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." See Graham v. Connor, 490 U.S. 386, 396 (1989). As the Supreme Court has observed: "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded . . . . When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." Terry, 392 U.S. at 23-24.

---

[11] To the extent plaintiffs contend the use of guns transforms an investigative stop into an arrest requiring probable cause, Ninth Circuit authority is to the contrary. See Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (1995) ("Pointing a weapon at a suspect, ordering him to lie on the ground, handcuffing him, and placing him for a brief period in a police vehicle for questioning – whether singly or in combination – does not automatically convert an investigatory detention into an arrest requiring probable cause.")

1    Here, the officers had an articulable and reasonable suspicion that a serious,
2 potentially dangerous felony offense was in progress and that the suspects were likely to
3 be armed.  See Allen, 66 F.3d at 1056 (holding officer's pointing of gun at suspect
4 reasonable where officer could not rule out auto theft).  Moreover, it was still dark outside,
5 there were two suspects, and only two officers had arrived at the time of the initial
6 detention.  See id. at 1057 (noting "police officers are entitled to employ reasonable
7 methods to protect themselves and others in potentially dangerous situations"); see also
8 Morgan v. City of Pleasant Hill, No. C-04-04865-CRB, 2005 WL 3454143 (N.D. Cal. Dec.
9 16, 2005) (holding officers' drawing and pointing of firearms at suspects not excessive force
10 where officers believed plaintiff "was in the midst of committing a serious felony" at night
11 and a reasonable officer would believe one committing such crime at night "could very well
12 be armed"); cf. Robinson v. Solano County, 278 F.3d 1007, 1014 (9th Cir. 2002) (holding
13 officers' drawing and pointing of firearms constituted excessive force where "[t]he crime
14 under investigation was at most a misdemeanor; the suspect was apparently unarmed and
15 approaching the officers in a peaceful way[;] [t]here were no dangerous or exigent
16 circumstances apparent at the time of the detention, and the officers outnumbered
17 plaintiff").

18    To the extent plaintiffs imply Ray's attire changes the analysis, plaintiffs cite to no
19 authority, and the Court is aware of none, suggesting, let alone holding, that because a
20 suspect is wearing nightclothes, such suspect does not pose a threat to officer safety.
21 Indeed, the evidence is undisputed that Ray's "bulky robe" could well have concealed a
22 weapon.  (See Use of Force Report; see also Hoppenhauer Dep. 81-84 (stating that in her
23 and other officers' experience, burglars have been known to carry knives, guns, and tools
24 to gain entry into cars, and, consequently, she would not keep her service weapon
25 holstered based on suspect's attire where she could not see suspect's waistband).)  Cf.
26 Robinson, 278 F.3d at 1010, 1014 (finding excessive force where officers detained suspect
27 with guns drawn because, inter alia, suspect's clothing revealed suspect no longer carrying
28 shotgun).

9

In sum, assuming they were acting pursuant to a policy requiring them to do so, the undisputed evidence demonstrates, as a matter of law, it was objectively reasonable for the officers to have their guns in hand when initiating the investigatory detention at issue.

Accordingly, plaintiffs have failed to raise a triable issue as to their Section 1983 claims,[12] and the City is entitled to summary judgment thereon.[13]

### 2.    State Claims

The instant action was removed on the basis of a federal question, specifically, plaintiffs' claims for deprivation of civil rights under § 1983 (see Notice of Removal, filed July 29, 2008), and the Court's jurisdiction over plaintiffs' state statutory and common law claims is supplemental in nature.  Where a "district court has dismissed all claims over which it has original jurisdiction," such court may decline to exercise supplemental jurisdiction.  See 28 U.S.C. § 1367(c)(3).  Here, in light of the dismissal of plaintiffs' federal claims, the Court finds it appropriate to decline supplemental jurisdiction over plaintiffs' state law claims, and particularly given the multiplicity of such state law claims, see, e.g., 28 U.S.C. § 1367 (district court may decline to exercise supplemental jurisdiction over claims that "substantially predominate[ ] over the claim or claims over which the district court has original jurisdiction"), and because any analysis under state law would differ substantially from that applicable to plaintiffs' federal claims, see, e.g., Robinson, 278 F.3d at 1016 ("California . . . has rejected the *Monell* rule and imposes liability on [municipalities] under the doctrine of respondeat superior for acts of [municipal] employees . . . ."); Cal. Gov't Code § 815.2 (providing respondeat superior liability for municipalities).

---

[12] To the extent plaintiffs allege, as part of their § 1983 claims, equal protection and invasion of privacy violations in connection with the officers' initial approach, plaintiffs have presented no evidence in support thereof, and any such claim likewise fails.

[13] With respect to the "Doe" defendants, the City likewise is entitled to summary judgment on all federal claims as alleged against such defendants.  "There is no provision in the Federal Statutes or Federal Rules of Civil Procedure for use of fictitious parties."  See Fifty Associates v. Prudential Ins. of America, 446 F.2d 1187, 1191 (9th Cir. 1970); see also Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's grant of summary judgment in favor of non-appearing defendant).

**CONCLUSION**

For the reasons stated above:

1. The City's Motion for Summary Judgment is hereby GRANTED with respect to plaintiffs' federal claims.
2. Plaintiffs' state law claims are hereby REMANDED to the California Superior Court in and for the County of Alameda.

**IT IS SO ORDERED.**

Dated: October 16, 2009

MAXINE M. CHESNEY
United States District Judge